UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUZANNE K. JOHNSON, | Case No.: 19cv1036 GPC (WVG) |
| Petitioner, | |
| | **ORDER GRANTING MOTION TO DISMISS AND GRANTING CERTIFICATE OF APPEALABILITY** |
| v. | |
| JANEL ESPINOZA, Warden et al., | |
| Respondents. | |

## I.     <u>INTRODUCTION</u>

Petitioner Suzanne K. Johnson is a state prisoner proceeding with counsel with a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 ("Petition" or "Pet."). Johnson contends her due process rights have been violated because the scientific evidence introduced at her trial has now been discredited and was false. (Pet., ECF No. 1 at 133-62.) She also contends trial counsel was ineffective. (*Id.* at 162-67.) Respondent has filed a Motion to Dismiss on timeliness grounds, and Johnson has filed an Opposition. (ECF Nos. 8, 11.)

The Court has read and considered the Petition, [ECF No. 1], the Motion to Dismiss and Memorandum of Points and Authorities in Support of the Motion to Dismiss [ECF No. 8, 8-1], the Opposition to the Motion to Dismiss [ECF No. 11], the lodgments and other documents filed in this case, and the legal arguments presented by both parties.

For the reasons discussed below, the Court **GRANTS** the Motion to Dismiss and **DISMISSES** the case with prejudice. The Court **GRANTS** a Certificate of Appealability.

## II. PROCEDURAL BACKGROUND

On January 19, 1999, the San Diego County District Attorney's Office filed an Amended Information charging Suzanne Kathryn Johnson with one count of assault on a child resulting in death, a violation of California Penal Code § 273ab. (Lodgment No. 3 vol. 1, ECF No. 9-25 at 45.) Following a jury trial, Johnson was convicted of the sole count before the jury. (*Id.* at 127.) She was sentenced to twenty-five years-to-life in prison. (Lodgment No. 3 vol. 2, ECF No. 9-28 at 29.)

Johnson appealed her conviction to the California Court of Appeal, Fourth District, which upheld her conviction. (Lodgment No. 7, ECF No. 9-32.) Johnson filed a petition for review in the California Supreme Court, which summarily denied the petition. (Lodgment Nos. 8-9, ECF Nos. 33-34.)

In 2015, Johnson filed a petition for writ of habeas corpus in the San Diego Superior Court and the state court issued an Order to Show Cause. (Lodgment Nos. 10-13, ECF Nos. 9-35–9-38.) Following this briefing, the state superior court issued an Opinion and Order denying the petition. (Lodgment No. 14, ECF No. 9-39.)

In 2017, Johnson filed a petition for writ of habeas corpus in the California Court of Appeal for the Fourth Appellate District. (Lodgment Nos. 15-16, ECF Nos. 9-40–9-42.) The state appellate court denied the petition in a written opinion. (Lodgment No. 17, ECF No. 9-43.) She thereafter filed a petition for writ of habeas corpus in the California Supreme Court. (Lodgment Nos. 18-20, ECF Nos. 9-44–9-46.) The California Supreme Court summarily denied the petition. (Lodgment No. 21, ECF No. 9-47.)

On June 3, 2019, Johnson filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 in this Court. (Pet., ECF No. 1, 1-2–1-6.) Respondent filed a motion to / / /

dismiss on July 1, 2019.  (ECF No. 8.)  Johnson filed an opposition to the motion to dismiss on September 11, 2019.  (ECF No. 11.)

## III.  **DISCUSSION**

Johnson was convicted in 1999 of assault on a child resulting in death, a violation of California Penal Code § 273ab, for the death of a baby girl in her daycare.  The prosecution alleged Johnson assaulted the victim, Jasmine Miller, by shaking and slamming her into a fixed surface causing fatal head injuries.  (Lodgment No. 3 vol. 1, ECF No. 9-25 at 127.)  After pursuing her appellate remedies in state court, Johnson has now filed a habeas corpus action pursuant to 28 U.S.C. § 2254 in this Court contending that her due process rights have been violated because the scientific theories upon which her convictions are based have been disproven and her trial counsel was ineffective. (Pet., ECF No. 1 at 44-174.)  Respondent has filed a motion to dismiss, arguing the Petition is untimely and Johnson concedes that it is.  (Answer, ECF No. 8-1; Pet., ECF No. 1 at 127.)  Johnson argues, however, that she has suffered a "fundamental miscarriage of justice" sufficient to establish that she is actually innocent of the charges against her and she may therefore be excused from the statute of limitations imposed by the Antiterrorism and Effective Death Penalty Act (AEDPA).  *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013); *Schlup v. Delo*, 513 U.S. 298, 301 (1995); *Herrera v. Collins*, 506 U.S. 390, 404 (1993).

A.  Legal Framework

Under AEDPA a one-year period of limitation applies to a petition for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period runs from the latest of:

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C.A. § 2244(d)(1)(A)-(D) (West Supp. 2002).

Johnson's conviction became final on May 15, 2001 and AEDPA's statute of limitations expired on May 15, 2002. *See McMonagle v. Meyer*, 802 F.3d 1093, 1097 (9th Cir. 2015)*; Bowen v. Roe*, 188 F.3d 1157, 1158-59 (9th Cir. 1999) (stating that where no petition for certiorari is filed in the United States Supreme Court, convictions become final ninety days after the California Supreme Court denies a petition for review). Her Petition, filed in this Court on June 3, 2019, is well past the statute of limitations. In *Schlup*, however, the Supreme Court explained that a petitioner's claim of actual innocence can act as a "gateway" to having his otherwise procedurally defaulted claims considered by a federal court. *Schlup*, 513 U.S. at 326-27. In *McQuiggin*, the Supreme Court applied the same logic to petitions filed after the expiration of AEDPA's statute of limitations. *McQuiggin*, 569 U.S. at 399. The Court has noted the standard is "demanding." *Id.* at 401. A petitioner must establish that she is actually innocent of the charges against her and that "'it is more likely than not that no reasonable juror would have convicted [her] in light of the new evidence.'" *McQuiggin*, 569 U.S. at 399, quoting *Schlup*, 513 U.S. at 327. "The gateway should open only when a petition presents 'evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.'" *Id.* at 401, quoting *Schlup*, 513 U.S. at 316.

"To be credible, [a claim of actual innocence] requires [a] petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial. *Id.* at 324. The reviewing court "must assess the probative

force of the newly presented evidence in connection with the evidence of guilt adduced at trial." *Id.* at 332. The *Schlup* Court noted the difference between the standard applied in sufficiency of the evidence claims, as enunciated in *Jackson v. Virginia*, 443 U.S. 307 (1979) and the standard to be applied in *Schlup* cases:

> The *Jackson* standard, which focuses on whether any rational juror could have convicted, looks to whether there is sufficient evidence which, if credited, could support the conviction. The *Jackson* standard thus differs in at least two important ways from the *Carrier* standard. First, under *Jackson*, the assessment of the credibility of witnesses is generally beyond the scope of review. In contrast, under the gateway standard we describe today, the newly presented evidence may indeed call into question the credibility of the witnesses presented at trial. In such a case, the habeas court may have to make some credibility assessments. Second, and more fundamentally, the focus of the inquiry is different under *Jackson* than under *Carrier*. Under *Jackson*, the use of the word "could" focuses the inquiry on the power of the trier of fact to reach its conclusion. Under *Carrier*, the use of the word "would" focuses the inquiry on the likely behavior of the trier of fact.

*Id.* at 330.

The question before this Court, therefore, is whether Johnson's new evidence, taken together with the evidence presented at her trial, is sufficient for this Court to conclude that no rational juror would have convicted her. *Id.*

B. Discussion

As science has advanced, so has the use of scientific evidence in criminal prosecutions. DNA evidence, for example, has played a significant role in both convicting and exonerating defendants. The use of scientific evidence in this manner, however, has not been without its critics. Over time, the basis for such evidence or its interpretation can be questioned and even disavowed. This case addresses such a situation. The main thrust of Johnson's Petition is that she was convicted based upon a now disproven scientific theory, Shaken Baby Syndrome (SBS) or Shaken Impact Syndrome (SIS), which is currently referred to as Abusive Head Trauma (AHT). Specifically, Johnson contends that the current scientific understanding of what events could have resulted in the injuries Jasmine suffered and the mechanism of injury for

5

SBS/SIS/AHT have evolved since Johnson's trial to such a degree and the scientific evidence presented at her trial has been so undermined that it is false and cannot support her conviction.  (Pet., ECF No. 1 at 136-63.)

As Johnson's Petition recounts, SBS is a theory developed by Dr. Norman Guthkelch in 1971.  (Interview with Dr. Norman Guthkelch, NPR's Morning Edition (June 29, 2011).)  The SBS theory originally posited that children presenting with a "triad" of symptoms – subdural hematoma, retinal hemorrhages and brain swelling – and who had no other physical injuries such as broken bones or bruises were the victims of child abuse in the form of violent shaking.  (*Id*.)  SIS involves both shaking and impact of the child's head against a fixed object.  After this mechanism of injury was identified by physicians, pediatricians began testifying in criminal prosecutions of parents and other care givers that the presence of the triad was definitive proof of abuse because the child could not have suffered the injuries in any other way.  As more was learned about head trauma in children, the American Academy of Pediatrics renamed the mechanism of injury from "Shaken Baby Syndrome" or "Shaken Impact Syndrome" to "Abusive Head Trauma" in 2009.  AHT encompasses more than simply shaking an infant to include "both shaking and blunt impact."  Christian, C., et al., *Abusive Head Trauma in Infants and Children*, Pediatrics, Official Journal of the American Academy of Pediatrics (May 2009).  Concurrent with this change came a change in the range of symptoms that can be diagnostic of AHT, which now includes spinal and skin injuries, skull fractures and fractures or breaks in other bones such as ribs or long bones in addition to the original triad of injuries.  Christian, C., et al., *Understanding Abusive Head Trauma in Infants and Children, Answers from American's Pediatricians*, American Academy of Pediatrics, June 1, 2015; Joyce, T., et al., *Pediatric Abusive Head Trauma (Shaken Baby Syndrome)*, StatPearls [Internet] (Jan. 2019, updated Feb. 2019) (available at https://www.ncbi.nlm.nih.gov/books/NBK499836).

At Johnson's trial, the prosecution presented expert testimony from four doctors, Dr. Terri Haddix, the medical examiner who performed Jasmine's autopsy, Dr. Jan

Leetsma, a pediatric neuropathologist, Dr. Randall Alexander, a child abuse expert, who testified about Jasmine's injuries, the cause of her death, and the manner in which the injuries were likely inflicted, and Dr. Cynthia Hoecker, the emergency room physician who treated Jasmine. (Lodgment No. 1 vol. 3, ECF No. 9-3 at 54-188, vol. 5, ECF No. 9-5 at 4-141, vol. 6, ECF No. 9-6 at 5-70, vol. 7, ECF No. 9-7 at 14-188, vol. 8, ECF No. 9-8 at 170-78, vol. 9, ECF No. 9-9 at 3-53.) The prosecution also presented testimony from Dr. Carly Ward, a biomechanical engineer, who testified that Johnson's account of Jasmine's fall from the high chair could not have produced Jasmine's injuries. (Lodgment No. 1 vol. 8, ECF No. 9-8 at 66-170.) The defense presented testimony from a pediatrician, Dr. Janice Carter-Lourensz, who questioned the SBS/SIS/AHT diagnosis and mechanism of injury, and a biomechanical engineer who testified that Jasmine could have sustained her injuries from a fall from the high chair. (Lodgment No. 1 vol. 12, ECF No. 9-12 at 55-185, vol. 15-16, ECF No. 9-15 at 88-147, vol. 17, ECF No. 9-16 at 106-30, ECF No. 13-1 at 22-31.) Johnson asserts that the opinions given by these experts have now been shown to be baseless and that the injuries suffered by Jasmine could have resulted from the high chair fall Johnson described.

    1. Factual Background – Evidence Presented at Trial

    At about 3:09 p.m. on June 24, 1997, Suzanne Johnson, a day care provider, called 911 and reported that a baby in her care, Jasmine Miller, was choking and had stopped breathing. (Lodgment No. 3 vol. 1, ECF No. 9-25 at 133-35.) The 911 operator instructed Johnson on how to give Jasmine CPR. (Id. at 135-37.) Paramedics arrived at 3:20; Jasmine appeared "lifeless" with no pulse and she was not breathing. (Lodgment No. 1 vol. 4, ECF No. 9-4 at 37-38.) They began resuscitation efforts, including placing a breathing tube into Jasmine. (Id. at 38-40; Lodgment No. 1 vol. 7, ECF No. 9-7 at 8.) Medical personnel continued resuscitation efforts during transport to the hospital and at the emergency room. (Lodgment No. 1 vol. 8, ECF NO. 9-8 at 178.)

    Dr. Cynthia Hoecker treated Jasmine at the hospital emergency room. (Lodgment No. 1 vol. 8, ECF No. 9-8 at 176, vol. 9, ECF No. 9-9 at 4-5.) She testified that when

Jasmine arrived, she appeared to be dead and subsequent efforts to revive her were unsuccessful; she was declared dead at 3:50 p.m. (*Id.* at 4, 12.) When she examined Jasmine, she noted a flattened area on the back of her head, which she thought could be a skull fracture, and retinal hemorrhages. (*Id.* at 5-6.) Hoecker did not think Jasmine's injuries were consistent with choking and thought Jasmine could have been the victim of abuse. (*Id.* at 8.) Hoecker informed homicide detectives about her suspicions. (*Id.*)

Detectives interviewed Johnson first at her home and then at the police station. (Lodgment No. 1 vol. 6, ECF No. 9-6 at 88; Lodgment No. 3 vol. 1, ECF No. 9-25 at 139- 214.) Johnson first told police that she had been feeding Jasmine at about 2:30 when she began choking on food. (Lodgment No. 3 vol. 1, ECF No. 9-25 at 145, 148.) Johnson said she turned Jasmine over to try to get the vomit out of her mouth; Jasmine was limp and had stopped breathing so she called 911. (*Id.* at 155.) Jasmine was also gagging or gurgling. (*Id*. at 156.) When asked about a bruise on Jasmine's eye, Johnson told police she thought she had caused the bruise while she was administering CPR as directed by 911. (*Id.* at 154.) Johnson also told police Jasmine was having a difficult time adjusting to daycare and did not nap, cried a lot and refused to take a bottle. (*Id.* at 149, 170-71.)

Johnson at first denied Jasmine had fallen or hit her head while in her care, even when confronted with the fact that Jasmine had a skull fracture. (*Id.* at 183-92.) Eventually, Johnson told police Jasmine had fallen out of a high chair onto her back. (*Id.*, Lodgment No. 1 vol. 2, ECF No. 9-26 at 21-22.) When asked, Johnson told police she did not tell them about Jasmine's fall before because she did not see anything wrong with Jasmine's head after the fall and she thought Jasmine had choked to death. (*Id.* at 23.) She later demonstrated how the accident had occurred. Johnson told police she put Jasmine into the high chair but did not strap her in. (Lodgment No. 3 vol. 2, ECF No. 9-27 at 5.) She said she turned around to pick up the high chair tray and heard a thud and Jasmine was on the floor. (*Id.* at 6.) She did not see Jasmine fall. (*Id.* at 3, 6.) First, she told police she thought she may have caught her shorts on Jasmine's leg and knocked her

out of the chair.  (*Id.* at 43-44.)  Later, Johnson told police that Jasmine fell out of the high chair when Johnson caught her hand on a piece of the chair.  (*Id.* at 79.)

Dr. Haddix conducted Jasmine's autopsy.  (Lodgment No. 1 vol. 3, ECF No. 9-3 at 119.)  She testified that upon external examination, she saw a bruise on Jasmine's right eye and a bruise behind her left ear.  (*Id.* at 71.)  When Haddix examined Jasmine's brain, she found two skull fractures.  The fracture under the bruise behind her left ear was approximately two inches long and complex, consisting of both a linear fracture and in the center of the linear fracture a "punch-out" fracture, described as a "small circular area which appeared to be punched out," or "like a hole punch."  (*Id.* at 73, 80.)  There was also a five-and-a-half to six-inch long fracture on the right side of Jasmine's skull and Haddix found fresh blood layered over the left side of Jasmine's brain and fresh blood around her spinal cord.  (*Id.* at 74-75, 88.)  There was a subdural hemorrhage on the left side of her brain.  (*Id.* at 73-74.)  She also found multiple, fresh bilateral retinal hemorrhages in Jasmine's eyes.  (*Id.* at 88, 91.)  In addition, she found an older subdural hemorrhage that she estimated to be two to four weeks old, and there were "indications that there had been a previous hemorrhage around the spinal cord."  (*Id.* at 111, 116.)

Haddix concluded that all of Jasmine's injuries, except the old subdural hemorrhage, were the result of one event and that the cause of Jasmine's death was non-accidental blunt force trauma to her head.  (*Id.* at 88, 119.)  She was not sure whether shaking played any role in Jasmine's injuries and death.  (*Id.* at 51.)  Haddix postulated that the fractures, acute subdural hemorrhage and retinal hemorrhages resulted from Jasmine's head being slammed into a fixed object that had a raised surface.  (*Id.* at 93-95.)  She further postulated that it would require "substantial force" to result in these injuries, such as the force experienced by an unrestrained child in a car accident.  (*Id.* at 97.)  Jasmine would have lost consciousness within two minutes of the infliction of the injury and Johnson's account of how the injury occurred was not reasonable or consistent with Jasmine's injuries.  (*Id.* at 105, 119-20, 122.)  Haddix testified the "punch-out" portion of the fracture had to have been caused by something elevated or protruding from

9

a flat surface or the corner or edge of an object.  (*Id*. at 87.)  Falling on a flat floor would not produce the "punch-out" fracture.  (*Id*. at 88.)

Dr. Leetsma concurred with many of Haddix's conclusions, including her conclusion that the "punch-out" fracture was the result of Jasmine's head hitting the edge of an object or a raised portion of a flat surface.  (Lodgment No. 1 vol. 5, ECF No. 9-5 at 95-98.)  He did not, however, believe that both of Jasmine's skull fractures had occurred at the same time.  (*Id.* at 42.)  He testified the left fracture appeared fresh and the right fracture showed some healing but agreed that it was reasonable to conclude the left fracture had at least extended the right skull fracture.  (*Id.* at 43-44.)  Leetsma agreed Jasmine had bilateral retinal hemorrhages and testified there was evidence of older retinal hemorrhages as well.  (*Id.* at 44.)  And, Leetsma agreed Jasmine had an older subdural hemorrhage and an older spinal cord hemorrhage that was at least two weeks old.  (*Id.* at 33-40.)  From this Leetsma concluded that Jasmine had "suffered a traumatic episode with impact a couple of weeks or so before death," and an acute "impact behind the left ear" which led to her death; in addition, "there may have been an element of shaking to it."  (*Id.* at 30, 47-48.)  Leetsma agreed with Haddix that Jasmine would have become unconscious immediately after sustaining her injuries.  (*Id.* at 30.)  Based on his observations of "red neurons" in Jasmine's brain, he estimated Jasmine would have been unconscious by about 1:50 p.m., over an hour before Johnson called 911.  (*Id.* at 23.)  He also testified that Johnson's story about how Jasmine's injuries occurred did not match the injuries he observed.  (*Id.* at 55.)  In order to produce the "punch-out" fracture, Jasmine's head had to have impacted "a pebble, an edge, [or] a protruding surface of some sort" with sufficient force.  (*Id.*)

Dr. Randall Alexander testified as an expert on child abuse and SBS and SIS. (Lodgment No. 1 vol. 7, ECF No. 9-7 at 32.)  Alexander testified about the triad of symptoms associated with SBS/SIS: subdural hemorrhages, retinal hemorrhages and cerebral swelling.  (*Id.* at 38-40.)  SIS cases exhibit SBS symptoms plus bruising or skull fractures at the point of impact.  (*Id.* at 40.)  Given Jasmine's injuries, Alexander believed

she was a victim of SIS and that her injuries were a result of an impact with some shaking component. (*Id.* at 61.) According to Alexander, Jasmine would have been immediately unconscious and would not have looked like a normal child. (*Id.* at 62.) Alexander further testified that Jasmine's injuries could not have come from a high chair fall because there was not enough height or force to have produced them. (*Id.* at 84-86.) The injuries would have required significant force, like a fall from a three-story building. (*Id.* at 100.) He further testified that short falls cause fractures in rare cases but do not cause retinal hemorrhages or death. (*Id.* at 105.) In his opinion, the injuries were non-accidental because they were "very significant injuries that wouldn't occur through anything Jasmine could do," nor could they be from a short fall. (*Id.* at 83.)

Dr. Carley Ward, a biomechanical engineer, testified that she could not reproduce Jasmine's injuries when she tried to replicate the accident as described by Johnson using the high chair and a sample of Johnson's carpet. (Lodgment No. 1 vol. 8, ECF No. 9-8 at 81-87.) Specifically, she could not create a scenario where the dummy she was using landed on her back and hit the back of her head on the floor, as Johnson claimed. (*Id.* at 88, 108-12.) Ward found it took nine pounds of pressure to start tipping the high chair and "to really move the chair as [Johnson] described, you'd have to have about 11 pounds of force on the chair." (*Id.* at 82.) In her opinion, it was not possible for Jasmine to have fallen or have been launched out of the high chair in the manner described by Johnson and sustain a fracture on the back of her head. (*Id.* at 121.) She also testified that Jasmine's injuries were too severe to have been caused by a fall from the high chair. (*Id.*)

Dr. Janice Carter-Lourensz, a pediatrician who specialized in child abuse and child development, testified for the defense. She stated that the medical community had developed an almost religious belief in SBS and that a triad of symptoms, retinal hemorrhages, subdural hemorrhages and cerebral swelling, was diagnostic of abuse. (Lodgment No. 1 vol. 12, ECF No. 9-12 at 64-65.) She disputed the idea that the presence of these injuries determined whether the injuries were accidental or inflicted. (*Id.*) Carter-Lourensz testified that retinal hemorrhages could be caused by a rapid rise in

intercranial pressure, impacts to the head and CPR.  (*Id.* at 66-69.)  She also testified that short falls can produce fatal head injuries and that children with such injuries can have lucid intervals after they are injured during which time they appear to be normal.  (*Id.* at 69-73.)  In addition, she said that prior head trauma that led to a subdural hemorrhage can rebleed and increase the severity of new head trauma.  (*Id*. at 81-82.)  Carter-Lourensz stated that the cause of Jasmine's death was blunt force trauma, not shaking, but that there was no way to determine whether the injury was accidental or inflicted.  (*Id.* at 95-96.)

The defense also called Dr. Peter Francis, a biomechanical engineer.  (Lodgment No. 1 vol. 15-16, ECF No. 9-15 at 88.)  Francis testified that Dr. Ward's reenactment of the fall based on Johnson's description of the event could not be accurate because there were inconsistencies in Johnson's description of the event and because there is "no way of knowing from any of the information I've had exactly where the baby was seated, which position of the body, where in relation to the chair . . . the direction of force or the amount of force that was applied."  (*Id.* at 95.)  In addition, according to Francis, Ward's reenactment did not account for the ability of Jasmine's body to move in space.  (*Id.* at 97-99.)  Ward also did not account for how the high chair may have moved on the floor's surface.  (*Id.* at 100-01.)  Francis found from his own experiment with the actual high chair and carpet that was on Johnson's floor at the time of Jasmine's death that it took six pounds of pressure, not the eleven pounds Ward found.  (*Id.* at 103.)  Further, during Francis's experiments, the high chair rotated nearly every time he tried to topple the high chair during his experiments.  (*Id.* at 104.)  The rotation of the chair would have an effect on how Jasmine would have landed on the floor.  (*Id.* at 105-15.)  According to Francis, there would be infinite variations of how a human hand would exert force on the chair and thus infinite variations of how the high chair would rotate and topple.  (*Id*. at 109-10.)  Francis believed there were "many different permutations, combinations, with a flexible infant with these three dimensional movements, not a simple flop, that would produce a blow anywhere on the rear portion of the head."  (*Id.* at 115.)

The defense also called character witnesses, including Johnson's family members, her boyfriend and parents of children for whom Johnson provided daycare. All testified that Johnson was a loving person who would not hurt a child. (*Id.* at 4-88, Lodgment No. 1 vol. 17, ECF No. 9-16 at 26-44.) In rebuttal, the prosecution presented two parents of children to whom Johnson had provided daycare. Michael McKinnis testified that in 1992 he picked his eleven-month-old daughter Chelsea up from Johnson's daycare. (Lodgment No. 1 vol. 17, ECF No. 9-16 at 46.) Johnson told McKinnis that Chelsea had fallen, had "screamed and cried" after the fall, and had been fussy and needed to be held for the rest of the day. (*Id.* at 47-49.) McKinnis took Chelsea to dinner with his wife and they noticed that Chelsea would not use her left arm. (*Id.* at 50.) The arm was "just hanging there and limp." (*Id.* at 52.) The parents called their pediatrician, who suggested the arm may be dislocated and directed the parents on how to correct the dislocation. (*Id.* at 52.) Chelsea screamed and was in obvious pain, and the parents took her to the emergency room where Chelsea was diagnosed with a broken left humerus (upper arm). (*Id.* at 53-54.) The arm was casted and the family returned home, but the next day the hospital called and told them there was an older fracture near Chelsea's wrist on the same arm. (*Id.* at 54.) A subsequent investigation of Chelsea's parents exonerated them, and the parents removed Chelsea from Johnson's care. (*Id.* at 57.) McKinnis also testified that while Chelsea was in Johnson's care, he saw Johnson pick up children, including infants, by their upper arms and pull them toward her, which concerned McKinnis. (*Id.* at 58.) Dr. Wendy Wright, one of the doctors who treated Chelsea, testified that given that the humerus is a "fairly big bone . . . it takes a fairly significant amount of force to break that bone" and the force of an eleven-month-old falling would not be enough. (*Id.* at 85, 90.)

Valerie Adams also had a child in Johnson's care around the same time as the McKinnises. (*Id.* at 68.) Her son Cameron was ten weeks old when Johnson cared for him for a two-week period in about 1991. (*Id.* at 68-69.) Johnson was scheduled to be hospitalized during the initial period of Cameron's attendance and Johnson's daughter

offered to look after Cameron in her mother's absence; and Adams accepted. (*Id.* at 70.) When Adams took Cameron back to Johnson, Johnson was very hostile and upset that Adams had taken Cameron to Johnson's daughter for care. (ECF No. 13-1 at 8.) Adams took Cameron out of Johnson's care because she did not feel he was safe. (Lodgment No. 1 vol. 17, ECF No. 9-16 at 69-71.)

2. <u>New Evidence</u>

Johnson has provided reports and declarations from eight medical experts who express varying opinions about the testimony at Johnson's trial, Jasmine's injuries, her cause of death and the likelihood her injuries could have been caused by a fall from a high chair. (Petr's Exs., ECF No. 1-4 at 247-305.) Two of the experts, Drs. Leetsma and Haddix, testified at the trial. Neither one retracts their conclusion that Jasmine was the victim of non-accidental trauma. (Petr's Ex., ECF Nos. 1-4 at 302-05, 1-6 at 4-6.) Dr. Leetsma's letter states that were he to testify today, he would qualify his testimony regarding how accurate the presence of "red neurons" can reconstruct how long a person's brain was without oxygen, and therefore how quickly a person would become unconscious, by noting that such reconstruction is "imprecise" and that "such imprecision must be considered against the body of evidence or lack thereof in this case." (Petr's Ex., ECF No. 1-4 at 304.) Dr. Haddix states that she would not substantively change any of her opinions regarding the injuries Jasmine suffered or the mechanism of injury, although she does say she would modify her testimony regarding how long Jasmine would have been conscious after she was injured from "a few minutes" and "at the outside . . . a couple of hours" to simply "not an extended period of time." (Petr's Ex., ECF No. 1-6 at 4-6.) She also states that while she testified at trial that "You don't die from short falls," she is aware of cases where a short fall has resulted in death but that "the potential lethality of short distance falls is far from universally accepted by forensic pathologists, neuropathologists and pediatricians." (*Id.*) Five of the medical experts call into question the scientific basis for SBS/SIS/AHT and the trial experts' testimony that linked Jasmine's injuries to a diagnosis of SBS/SIS/AHT, dispute the trial testimony regarding

the lethality of short falls and whether children can experience "lucid intervals" after sustaining a fatal head injury, and/or posit that Jasmine's injuries could have been the result of the fall from the high chair. (Petr's Ex., ECF No. 1-4 at 248-78, 292-300.) One expert, a pediatric ophthalmologist, expresses an opinion regarding the retinal hemorrhages in Jasmine's eyes and concludes they were a result of SBS/SIS/AHT. (Petr's Ex., ECF No. 1-5 at 127-33.)

In addition to the medical experts, Johnson has submitted reports from a biomechanical engineer and an audio engineer. The biomechanical engineer, Dr. Chris Van Ee, states that current scientific knowledge confirms that short falls, that is, falls between 12 inches and 32 inches, can and do result in skull fractures. (Petr's Ex., ECF No. 1-4.) Van Ee asserts that, based on his and other research, "a fall off of a high chair of a normal healthy child of 6 months of age resulting in a direct head impact has the potential to cause serious and even fatal head injury consistent with the head injury reported for Jasmine." (*Id.* at 286.) According to Van Ee, such falls can and do also result in subdural hemorrhages and retinal hemorrhages. (*Id.* 285.) He further states that given Jasmine had a prior subdural hemorrhage, the threshold for a new injury to result in a serious head injury was lower. (*Id.*) The audio engineer, Michael Gburzynski, enhanced the 911 tape and discovered a noise, other than the voices of Johnson and the 911 operator, which fell within the range of human voice. (Petr's Ex., ECF No. 1-5.) The noise occurs at the point in the tape that Johnson says, "Did you hear that? That was her." (*Id.* at 21.) Dr. Nichols states in his report that he listened to the enhanced tape and the noises he heard were consistent with "a child struggling to breathe through partially obstructed airways," which he says means Jasmine was alive at the time of the 911 call. (Petr's Ex., ECF No. 1-4 at 293.)

a. Retinal Hemorrhages, Cerebral Edema and Subdural Hemorrhage (the "triad")

Johnson contends the medical experts at her trial testified that a series of three injuries known as "the triad" – retinal hemorrhages, subdural hemorrhages and cerebral edema – could only have been produced by violent incident of shaking and impact and

were thus diagnostic of SBS/SIS/AHT, and that they could not have resulted from the fall from the high chair Johnson recounted. (Pet., ECF No. 1 at 75-125, 136-44.) She further contends the prosecution experts testified that the presence of this triad of injuries is diagnostic of SBS/SIS/AHT. According to Johnson, current scientific and medical research has now determined that there was no scientific basis for the experts' assertions, and her conviction was therefore based on false evidence. (*Id.*) Given this new information, she claims that no reasonable juror would convict her. (*Id.*)

### i. Retinal Hemorrhages

Johnson states that the experts presented by the prosecution at her trial testified that retinal hemorrhages are caused by violent shaking and are diagnostic of abuse. She claims there is no scientific basis for this claim and that retinal hemorrhages are no longer considered diagnostic of SBS/SIS/AHT. (Pet., ECF No. 1 at 91-98, 141-43.)

At trial, Dr. Haddix testified she observed multiple, fresh bilateral retinal hemorrhages during Jasmine's autopsy which were one to two days old. (Lodgment No. 1 vol. 3, ECF No. 9-3 at 89.) She believed the retinal hemorrhages were the consequence of the same incident which produced the skull fractures and other injuries. (*Id.* at 91.) According to Haddix, in addition to shaking, retinal hemorrhages result from rapid deceleration, "a sudden abrupt stop of the head against something unyielding." (*Id.* at 94-95.) She believed Jasmine's head had been struck against something fixed, and she did not believe a fall such as the one described by Johnson could have produced sufficient acceleration to cause the retinal hemorrhages. (*Id.* at 94, 154.) According to Haddix, skull fractures alone do not generally produce retinal hemorrhages because "usually retinal hemorrhages are seen associated with forces of greater magnitude than that producing merely the skull fracture," but they "can be seen with skull fractures in combination with subdural[] [hemorrhages]." (*Id.* at 187.)

Dr. Leetsma testified Jasmine had both fresh and old bilateral retinal hemorrhages. (Lodgment No. 1 vol. 5, ECF No. 9-5 at 44.) The fresh ones were under a day old. (*Id.* at 45.) Leetsma testified that while it is not absolute, the presence of retinal hemorrhages

with a subdural hemorrhage is a "pretty strong marker for the child having been shaken." (*Id.* at 48.) Given all of Jasmine's injuries, he believed that taken together "the conclusion becomes pretty strong that an impact certainly occurred, and there may have been some element of shaking connected with it." (*Id.*) Leetsma went on to say the following:

> I think, as I say, I think there are some inferences; one of them being that in infants that show retinal hemorrhages, there is a strong likelihood that battering or abuse was involved. Some would take it farther to say that it meant shaking. I think statistically that is probably correct. But that doesn't elevate us to the level of confidence you'd say: Well, maybe that's true six out of eight times, or maybe eight out of ten times. But what about the other percent? It means there may be some other interpretation.

(*Id.* at 78-79.)

Leetsma further testified that other things, such as CPR, can cause retinal hemorrhages and they can also be caused by a "rapid rise or rapid changes in intercranial pressure" where no shaking occurred. (*Id.* at 121.) He testified he did not know if Jasmine had been shaken, but there was an impact with or without shaking. (Lodgment No. 1 vol. 6, ECF No. 9-6 at 59-60.) He agreed with defense counsel, however, that it was possible that "an impact sufficient to cause a subdural hematoma and swelling of the brain would rise [sic] intercranial pressure and cause retinal hemorrhaging without shaking." (*Id.* at 59.)

Dr. Alexander testified that although it is possible for intercranial pressure and other things to cause retinal hemorrhages, this did not occur in Jasmine's case because she did not have a lot of brain swelling and was not in the hospital and on a ventilator long enough for that to have occurred. (Lodgment No. 1 vol. 7, ECF No. 9-7 at 58-59.) The retinal hemorrhages along with the global brain injury is what led Alexander to conclude that Jasmine was the victim of some type of shaking incident. (*Id.* at 59.)

Dr. Hoecker testified she did not think retinal hemorrhages would be likely to result from a fall and that they "are usually the result of a shaking mechanism." (Lodgment No. 1 vol. 9, ECF No. 9-9 at 20.) She also testified that retinal hemorrhages

are "considered to be pretty much pathognomonic or significant for shaking, although I think this is a controversial area," and that "[t]here are people who believe that possibly other mechanisms could cause retinal hemorrhages other than a shaking injury." (*Id.* at 30.) She further testified that "[i]f you see retinal hemorrhages in an infant, that there is a 99 percent chance maybe that that child has been shaken, 99 percent or greater." (*Id.* at 33.) Hoecker disagreed with Leetsma that a rapid rise in intercranial pressure or CPR could produce retinal hemorrhages. (*Id.* at 31-32.)

Two of the new experts Johnson has presented in support of her Petition, Dr. John Plunkett, a forensic pathologist, and Dr. Harry Bonnell, former Chief Deputy Medical Examiner of San Diego County, expressed opinions on retinal hemorrhages. Plunkett reviewed Jasmine's medical records and trial testimony from Haddix and Leetsma. (Pet., ECF No. 1-4 at 248.) Plunkett states that retinal hemorrhages result from intracranial pressure or occlusion of retinal veins. (*Id.* at 250; Lodgment No. 1 vol. 5, ECF No. 9-5 at 121, vol. 6, ECF No. 9-6 at 59.) Dr. Plunkett notes that while much of the scientific literature states that retinal hemorrhages are "strongly associated with 'shaking' as a mechanism," some studies have shown that retinal hemorrhages "occur[] in a large number of cases of primary and even secondary brain injury" and not just in shaking cases. (*Id.*) He further states that retinal hemorrhages are a "cascade phenomenon" which "merely indicate[] that [Jasmine] had either structural or functional occlusion of the veins returning blood from the eyes to the heart." (*Id.*) Dr. Bonnell also reviewed Jasmine's medical records and the trial testimony. (*Id.* at 270.) He states that the belief that retinal hemorrhages are caused by shaking "has never been proven and is one of the major reasons the diagnosis of Shaken Baby Syndrome has been abandoned in favor of Abusive Head Trauma, which does not include any specific mechanism of injury." (*Id.* at 272.)

The opinions expressed by Drs. Plunkett and Bonnell are not altogether new to Johnson's case. Drs. Haddix and Leetsma, like Dr. Plunkett, both testified that retinal hemorrhages can be caused by things other than shaking. Haddix testified they can result

from "a sudden abrupt stop of the head against something unyielding," not just shaking, or "in combination with [skull fractures and] subdural[] [hemorrhages]." (Lodgment No. 1 vol. 3. ECF No. 9-3 at 94-95, 187.) In addition Leetsma, like Plunkett, testified that CPR or a "rapid rise or rapid changes in intercranial pressure" can cause retinal hemorrhages, and that "an impact sufficient to cause a subdural hematoma and swelling of the brain would rise [sic] intercranial pressure and cause retinal hemorrhaging without shaking." (Lodgment No. 1 vol. 5, ECF No. 9-5 at 59.) Notably, neither Dr. Haddix nor Dr. Leetsma, who have both submitted declarations, retract any of their trial testimony regarding retinal hemorrhages. (*Id.* at 4-6, 302-04.) Moreover, Dr. Bonnell's assertion that the term "Abusive Head Trauma" was coined because there is no proof that shaking causes retinal hemorrhages does not assist Johnson's claim. No expert has stated that Jasmine's injuries resulted from shaking alone. All have concluded that an impact of some sort, either intentional or accidental, was the cause of her injuries and that there may or may not have been a shaking component.

Moreover, the claim that the scientific community has abandoned the belief that retinal hemorrhages can be caused by shaking or shaking plus impact is an overstatement. While Johnson presents medical experts who contend that retinal hemorrhages cannot be produced by shaking or shaking plus impact, there are also recent scientific papers which have concluded the opposite. Duhaime, A., et al., *Abusive Head Trauma: Evidence, Obfuscation, and Informed Management*, Journal of Neurosurgery (Nov. 2019); Cowley, L., et al., *Validation of a Prediction Tool for Abusive Head Trauma*, Pediatrics (Aug. 2015); Maguire, S., et al., *Which Clinical Features Distinguish Inflicted From Non-Inflicted Brain Injury? A Systematic Review*, Arch. Dis. Child. (June 2009). Indeed, Dr. Reiber, one of Johnson's new experts, states in his report that the presence of retinal hemorrhages suggests shaking as a mechanism of injury. (Petr's Ex., ECF No. 1-4 at 297.)

In addition, Drs. Plunkett and Bonnell are not experts in the field of pediatric ophthalmology. Dr. Alex Levin, Chief of Pediatric Ophthalmology at WillsEye Hospital,

however, is such an expert. He reviewed Jasmine's medical records and microscopic slides of her eye tissue and submitted a report to San Diego Assistant District Attorney Kathryn Gayle. (Pet., ECF No. 1-4 at 128.) Citing several studies from 2000 to 2015, he states that the particular type of retinal hemorrhages seen in Jasmine's eyes are "highly indicative of child abuse in the absence of fatal head crush, motor vehicle accident or an 11 meter fall onto concrete." (*Id.* at 131.) He further states that there is no other "viable explanation for the ocular findings," and though he agrees with Plunkett, Ophoeven, Bonnell and Leetsma that "retinal hemorrhages and subdural hemorrhages are not pathognomic of abuse, . . . they offer no other cause for the findings in this child." (*Id.*)

The evidence regarding retinal hemorrhages submitted by Johnson does not meet the standards set forth in *Schlup* and *McQuiggin*. It is not "new" because prosecution experts at trial testified that retinal hemorrhages can result from events other than shaking or shaking and slamming. Further, the assertion that the medical community has unequivocally rejected the idea that retinal hemorrhages can help determine whether a child's injuries are accidental or intentional is not correct. There are experts who continue to believe, based on current scientific research, that retinal hemorrhages are an indicator of intentional injury and abuse. The Court is unable to conclude that, were a jury to consider the new and the old evidence together as required by *Schlup* and *McQuiggin*, no rational juror would convict Johnson of assault on a child causing death. *Schlup*, 513 U.S. at 301; *McQuiggin*, 569 U.S. at 386.

## ii. Cerebral Edema and Subdural Hemorrhages

Cerebral edema is the brain's response to trauma, whether accidental or non-accidental. (Pet., ECF No. 1 at 100-01; Lodgment No. 1 vol. 5, ECF No. 9-5 at 31, vol. 7, ECF No. 9-7 at 40.) Both the new experts and the trial experts in this case generally agree that Jasmine's brain showed "mild" or "modest" brain swelling. (Lodgment No. 1 vol. 3, ECF No. 9-3 at 137-42, vol. 7, ECF No. 9-7 at 59; Pet., ECF No. 1 at 265.) Dr. Haddix testified at the trial that in addition to subarachnoid and a subgaleal hemorrhages, Jasmine had a fresh subdural hemorrhage under the bruise she had behind her left ear

where the "punch-out" fracture was located. (Lodgment No. 1 vol. 3, ECF No. 9-3 at 79-83.) These hemorrhages, coupled with the skull fractures, indicated to Dr. Haddix that a "substantial force" was responsible for her injuries. (*Id.* at 93.) She believed that Jasmine's head had been struck against an object with some elevation. (*Id.* at 94.) She did not believe a fall from a high chair could have caused the subdural hemorrhage because the skull fractures were complex and the forces required to produce them were more than a fall from a high chair could produce. (*Id.* at 97-98.) Dr. Haddix also testified that Jasmine had an older subdural hemorrhage which was two to four weeks old. (*Id.* at 111, 115.) Although there was some evidence of re-bleeding in the older subdural hemorrhage, she did not believe it contributed to Jasmine's death because the older hemorrhage was nearly healed, there was only a microscopic amount of blood associated with the re-bleeding, and because the new injuries were so severe. (*Id.* at 117-18.)

Dr. Leetsma agreed the subdural hemorrhage on the left side of Jasmine's brain was recent and that the skull fracture and hemorrhage were related. (Lodgment No. 1 vol. 5, ECF No. 9-5 at 29.) He also agreed that there was an old subdural hemorrhage that was "two weeks-plus old." (*Id.* at 38.) The "punch-out" fracture and the subdural hemorrhage underneath it indicated that "a protruding surface had to have impacted the head with sufficient force to indent at least the outer table of the skull." (*Id.* at 55.) Dr. Leetsma disagreed with Dr. Haddix, testifying that a child could get a subdural hemorrhage, skull fracture and brain swelling from a three-foot fall but that it would be "a rare occurrence." (*Id.* at 86, 101-02.) He also agreed with Dr. Haddix that old subdural hemorrhages can re-bleed and cause injury or death. (*Id.* at 116.)

Dr. Alexander testified the recent subdural hemorrhage associated with the "punch-out" fracture was "something that was usually seen[n] in connection with some variation of shaken baby syndrome or car crashes." (Lodgment No. 1 vol. 7, ECF No. 9-7 at 57.) He believed her injuries were from an impact and that "extensive subdural hemorrhage" was the result of a "huge amount of force, if you're talking about it from an impact, or it

would take some shaking component as well." (*Id.* at 61.) They were "significant injuries that wouldn't occur from anything Jasmine could do [and] they are not from falls from short heights." (*Id.* at 63.) He believed it was possible to get a skull fracture and a subdural hemorrhage from a short fall if the person "hit an edge or something," but that it "would be exceedingly rare." (*Id.* at 105.) He had no doubt the injuries were non-accidental. (*Id.* at 117.) Alexander said Jasmine's behavior before her death was consistent with her having an older subdural hemorrhage but in his opinion it did not contribute to her death. (*Id.* at 79.) Dr. Hoecker testified it was possible but very unlikely that a fall from 32 inches or less would result in a subdural hemorrhage. (Lodgment No. 1 vol. 9, ECF No. 9-9 at 20.) She had never seen such an injury. (*Id.* at 15.)

In his declaration submitted in support of Johnson's Petition, Dr. Plunkett states that subdural hemorrhages can result from impact, diseases or hypoxia. (Pet., ECF No. 1-4 at 249.) In Jasmine's case, Plunkett states, an impact caused her death, not disease. (*Id.*) Dr. Plunkett notes that Jasmine had a chronic subdural hemorrhage and states that "there is a decreased threshold for (re)injury until the SDH [subdural hemorrhage] has healed completely." (*Id.* at 251.) He states that "shaking is an unlikely mechanism for *brain* damage or SDH," and that "scientific studies suggest that it is not possible to shake an infant hard enough to cause a concussion, SDH, or traumatic brain injury." (*Id.* at 251 (emphasis in original).) No expert believes, however, that Jasmine's injuries were inflicted by shaking alone. Indeed, every expert states that Jasmine either died from blunt force trauma or that it was a contributing factor to her death. Moreover, Drs. Haddix and Leetsma testified at trial, consistent with Dr. Plunkett, that old subdural hemorrhages can re-bleed and even cause death. (Lodgment No. 1 vol. 3 at 117-18, vol. 5 at 116.) Thus, Dr. Plunkett's statements about whether shaking caused her subdural hemorrhage is not "[new, reliable] evidence of innocence so strong that it calls into question the reliability of the verdict." *McQuiggin*, 569 U.S. at 324, 399.

/ / /

22

Dr. Reiber also states in his declaration in support of Johnson's Petition that Jasmine had a recent and an older subdural hemorrhage. (Pet., ECF No. 1-4 at 297.) According to Reiber, both hemorrhages appear to have been caused by an impact, with the older subdural hemorrhage likely associated with the right skull fracture, while the left "punch-out" fracture is likely associated with the newer subdural hemorrhage. (*Id.*) Dr. Reiber agrees that the older subdural hemorrhage is two to four weeks old and that pre-existing subdural hemorrhages can re-bleed and can "make[] a worse outcome from a lesser impact more likely, although at least a moderate force would still be expected." (*Id.* at 297-98.) As noted above, Drs. Haddix and Leetsma's trial testimony was consistent with Dr. Reiber's declaration. Both doctors testified that Jasmine had an older and a more recent subdural hemorrhage and that chronic subdural hemorrhages can re-bleed and cause injury or death. (Lodgment No. 1 vol. 3, ECF No. 9-3 at 79-83, 111, 115, 117-18; vol. 5, ECF No. 9-5 at 38, 116.) Thus, weighing both the old and new evidence together, Dr. Reiber's report does not offer any exculpatory scientific evidence sufficient to establish that no rational juror would convict Johnson. *Schlup*, 513 U.S. at 301; *McQuiggin*, 569 U.S. at 386.

### iii. The "Triad" as Pathognomonic of Abuse

In addition to attacking the scientific basis for each of the components of the triad of injuries associated with SBS/SIS/AHT, Johnson attacks the very diagnosis of SBS/SIS/AHT, arguing that there is no reliable scientific basis for the claim that retinal hemorrhages, subdural hemorrhages and cerebral edema can be produced by shaking alone or shaking with impact, and that these injuries, when presented together, are not exclusively diagnostic of SBS/SIS/AHT because they can be produced by an accidental means. (Pet., ECF No. 1 at 80-101, 136-140.) Johnson claims that prosecution experts testified at her trial that the presence of the triad alone established that intentional and not accidental trauma was the cause of Jasmine's injuries and death. (*Id.*)

Dr. Haddix testified she believed a "substantial force" had been applied to Jasmine's head to have resulted in her injuries, such as her head being struck against a

fixed object with some elevation, and she suspected there was some element of a crushing force. (*Id.* at 94.) The retinal hemorrhages could have either been from shaking or from a rapid deceleration into a fixed object. (*Id.* at 94-95.) On cross examination, Dr. Haddix agreed that "non-accidental and accidental injuries can have an overlap of the type of injuries," and that "the mere presence of the subdural doesn't scream to me: Ahhha, this was inflicted; or: Oh, no, this was accidental. I can't say that." (*Id.* at 159.) She further testified that "with short falls, you can have skull fractures, and you can have subdurals." (*Id.*) In response to the question whether she could attribute the acute bleeding in Jasmine's neck area to a shaking incident, she replied that "there is clearly an impact, so it's more than shaking, if shaking played a role at all." (*Id.* at 161.) She agreed that children could suffer subdural hemorrhages and skull fractures from a 32-inch fall, and perhaps even retinal hemorrhages, but those skull fractures are usually "purely linear, straight-line skull fracture[s]." (*Id.* at 88, 98, 168.) Jasmine's skull fracture, however, was complex and the "punch-out" portion would not have resulted from a fall onto a flat, carpeted surface as Johnson claims. (*Id.* at 88.) She found the possibility that an infant could suffer a subdural hemorrhages and die from an 18-inch fall "very suspect," and that it would require "terrific investigation" to determine whether it was true. (*Id.* at 170.) Dr. Haddix did not testify that Jasmine's injuries – the triad – were diagnostic of intentional rather than inflicted trauma; rather, she concluded from the range and severity of Jasmine's injuries that "there is no reasonable explanation in my mind from what I have been presented . . . to account for the injuries I saw here," she concluded the death was non-accidental. (*Id.* at 119.)

Dr. Leetsma also did not tell the jury that the only way Jasmine could have suffered her injuries was from a non-accidental SBS/SIS/AHT incident. While he, like Dr. Haddix, opined that Johnson's version of the high chair accident did not account for

/ / /

/ / /

/ / /

Jasmine's injuries, he very clearly testified that abuse cannot be assumed simply because a child presented with a particular set of symptoms:

> [DEFENSE COUNSEL]: As an example, and you can correct me if I'm wrong, in the area of child abuse, I'm an expert, and I say retinal hemorrhaging plus an impact and inconsistent statement by the care giver is totally indicative of child abuse?
> [DR. LEETSMA]: Right. Okay. I've heard your statement.
>
> Q. Is that the dogma you're talking about?
>
> A. It may well be founded in dogma. I have to disagree with an absolute statement like that, and it is couched in dogma and belief and not subject to the data. The science – I try to approach my work from a scientific basis, which means you can question anything and everything. And the bottom-line response is: show me the data. If you say that's true, tell me why you think that. And we should have an intellectual free-for-all to try to see where the truth is.

(Lodgment No. 1 vol. 5, ECF No. 9-5 at 71.)

Dr. Leetsma explained that while accidental injuries can cause serious injuries, these injuries operate on a bell curve in which the majority of injuries are minor and fall in the middle of the bell curve, while there a few cases at the extremes on both ends of the curve where children can experience no injuries or severe injuries. (*Id.* at 75.) According to Dr. Leetsma, some experts ignore the extremes on both sides and conclude that it is impossible for some injuries to have resulted from short falls. (*Id.* at 76.) He also conceded that he could not medically rule out the possibility that a fall from a high chair could have caused the skull fractures and subdural hematoma. (Lodgment No. 1 vol. 6, ECF No. 9-6 at 41.) But in his opinion, he agreed with Dr. Haddix that Jasmine's injuries could not be reconciled with the story Johnson told about how she was injured. (*Id.* at 17-18.)

Dr. Alexander was the main expert on SBS/SIS/AHT. He described SBS as a baby being shaken "so violently that you actually cause brain damage and, in about a quarter of the cases that we see, death." (Lodgment No. 1 vol. 7, ECF No. 9-7 at 38.) He testified

that "the other place we see a marker of injury in about 90 percent of the cases in shaken-baby syndrome is in the back of the eyes . . . [and] we call that retinal hemorrhages." (*Id.* at 39.) In the case of SIS, a baby can be "shaken into something . . . [a]nd we might see evidence of a bruise on the outside; we might see a bruise on the inside . . . [y]ou might see a skull fracture . . . [which would be] an impact injury." (*Id.* at 40.) Alexander noted, however, that with SIS the "brain is affected all over . . . not just affected in the spot where the blow landed." (*Id.*) If there is simply evidence of an impact and "no retinal hemorrhages and no global brain issue, we just call that an impact." (*Id.*) Alexander agreed with Dr. Haddix that short falls can produce skull fractures in children but they are usually linear ones not complex "punch-out" ones like Jasmine's. (*Id.* at 48.) In addition, the fracture was at the back of Jasmine's head where the bone is thicker and thus required more significant force. (*Id.* at 54.) Dr. Alexander testified that "[t]hese are quite large fractures . . . . When we get skull x-rays from falls, we just don't see these kinds of things." (*Id.* at 56.) He also testified that "subdural hematoma, that's something that we usually see in connections with some variation of shaken-baby syndrome or car crashes." (*Id.* at 57.) In addition, Dr. Alexander noted that the injuries to Jasmine's brain were not centered on the point of impact but were more diffuse, and "that's something that fits much better with a shaking mechanism than just impact alone." (*Id.* at 59.) He also stated that the retinal hemorrhages of the type seen in Jasmine's eyes do not occur in impact injuries but do occur frequently in shaking injuries. (ECF No. 14-1 at 22.) Because of the extent of Jasmine's injuries and the global effect they had on her brain, he concluded they were from non-accidental trauma, specifically SBS/SIS/AHT. (*Id.* at 83.) The amount of force to create these injuries would be akin to a motor vehicle accident, falls from several stories, and SBS/SIS/AHT. (*Id.* at 56.) He believed Jasmine was the victim of an impact injury with a shaking element. (Lodgment No. 14-1 at 21.)

As discussed above, Johnson's experts note that retinal hemorrhages and subdural hemorrhages can be caused by events other than shaking or shaking plus impact. In addition, two of Johnson's experts, Drs. Ophoven and Plunkett, directly attack the

19cv1036 GPC (WVG)

SBS/SIS/AHT diagnosis. Dr. Ophoven states that "the theory of shaken infant is now thought to be a seriously flawed concept," and "[w]hat is now known is that children can and do suffer serious injuries from falls and more importantly can have fatal consequences from relatively minor trauma following serious head injuries." (Petr's Ex., ECF No. 1-4 at 268.) She goes on to state that "[i]t is my opinion to a reasonable degree of medical certainty that much of the medical evidence presented to the jury at the 1998 trial of Suzanne Johnson is now considered unsupported by current evidence based medicine." (*Id.*) Dr. Plunkett states that the assumptions made by doctors in 1999, that the low-velocity falls do not cause serious injury or death, children do not experience lucid intervals after suffering a fatal head injury, retinal hemorrhages are indicative of intentional versus accidental trauma, and that shaking an infant causes subdural hemorrhages, retinal hemorrhages, brain swelling and brain damage is not supportable now. (Petr's Ex., ECF No. 1-4 at 257.)

First, it is not correct, as Johnson claims, that the experts who testified for the prosecution at her trial asserted that the only way Jasmine could have sustained her injuries was from non-accidental trauma or that the mere presence of the triad of symptoms was conclusive proof that Jasmine was the victim of SBS/SIS/AHT. Rather, it was the nature of Jasmine's injuries – the severe and complex skull fracture and the extensive retinal hemorrhages – coupled with the improbability the high chair fall described by Johnson was the cause of those injuries and Johnson's delay in telling authorities how Jasmine had been injured that led them to that conclusion. Moreover, Johnson's assertion, based on the new expert opinions that she has presented, that "the triad of symptoms is no longer considered to be diagnostic of abuse," is an oversimplification of the current scientific consensus regarding non-accidental infant head trauma. As Johnson notes, it is true that some medical professionals and scientific papers question whether shaking a baby or shaking a baby plus impact produces a particular set of injuries that distinguish the mechanism of trauma as intentional versus accidental, but that view is far from universal. A 2009 study which reviewed scientific

27

literature in order to identify the most common clinical indicators of inflicted brain injury versus non-inflicted brain injury identified retinal hemorrhages as "strongly associated" with inflicted brain injury, particularly when the child also has an intracranial injury such as subdural hemorrhages. Maguire, S., et al., *Which Clinical Features Distinguish Inflicted From Non-Inflicted Brain Injury? A Systematic Review*, Arch. Dis. Child. at 865 (June 15, 2009.) A 2011 study of scientific literature published in the Archives of Disease in Childhood found that cerebral edema and subdural hemorrhages were "significantly associated with AHT." Kemp, A.M., et al., *Neuroimaging: What Neuroradiological Features Distinguish Abusive from Non-Abusive Head Trauma? A Systematic Review*, Arch. Dis. Child. (September 30, 2011.) A 2015 publication from The American Academy of Pediatrics (AAP) identifies "subdural hematomas (SDHs), with concomitant brain injury, and retinal hemorrhages (RHs), with or without additional injury" as "the hallmarks of child abuse and AHT . . . ." American Academy of Pediatrics, *Understanding Abusive Head Trauma in Infants and Children, Answer from American's Pediatricians* (June 1, 2015.) The AAP statement notes that in addition to the AAP, the diagnosis is recognized by The American Academy of Family Physicians, The American Academy of Ophthalmology, The American Association for Pediatric Ophthalmology and Strabismus, The American Academy of Neurologic Surgeons, The American College of Radiology, The American College of Surgeons, The Canadian Pediatric Society, The Centers for Disease Control and Prevention, The Royal College of Ophthalmologists, The Royal College of Paediatrics and Child Health, The Royal College of Radiologists, and The World Health Organization. (*Id*. at 8.) Another study of scientific literature published in 2015 in the American Journal of Roentgenology concluded that intracranial injuries, specifically subdural hemorrhages and cerebral edema, bruising of the head and neck and retinal hemorrhages were strongly associated with AHT. Greeley, C., *Abusive Head Trauma: A Review of the Evidence Base*, American Journal of Roentgenology (May 2015.) A 2018 article from Acta Paediatrica, a Swedish medical journal, notes that "the triad is highly relevant and of major practical

importance in the processing of suspected child abuse . . . ."  Lynoe, N., et al., *Is Focusing on the Triad in Suspected Child Abuse Cases Really Irrelevant and of No Practical Use?*, Acta Paediatrica (June 7, 2018.)  And a 2019 article in the Journal of Neurosurgery: Pediatrics states that "[d]espite controversies about shaking versus impact, children with certain constellations of head/brain and/or somatic injuries, in combination with a specific history or lack of history, who have no predisposing medical condition, can be clearly determined to be the victims of inflicted injury."  Duhaime, A., et al., *Abusive Head Trauma: Evidence, Obfuscation and Informed Management*, Journal of Neurosurgery: Pediatrics (Nov. 2019.)  The article further states that "SDH is identified in most victims of AHT, and most SDHs in infants result from abuse. . . . Retinal hemorrhages that are bilateral, severe, and include posterior pole and peripheral hemorrhages are characteristic of AHT."  (*Id.*)

In short, far from being "junk science," the use of a specific "constellation of injuries," i.e., subdural hemorrhage, cerebral edema and retinal hemorrhages (the "triad), to help diagnose SBS/SIS/AHT remains the subject of significant debate among medical professionals, with members of the medical profession on both sides who argue forcefully for their position.  It is not the case that the medical opinions given at Johnson's trial were wholly without foundation at the time they were given or that no medical professionals would testify today that Jasmine's injuries indicated she was the victim of non-accidental trauma.  It is true that were experts to be called today in such a trial the substance of the medical debate over how to determine whether Jasmine's injuries were inflicted or accidental would likely be more spirited.  Given the presence of such medical debate and experts who still believe in the basic premise of SBS/SIS/AHT, however, Johnson has not met her burden to establish that *no* reasonable juror would have voted to convict her.  *McQuiggin*, 569 U.S. at 399

b.  Red Neurons, Lucid Intervals and the 911 Call

Johnson testified that Jasmine fell out of the high chair somewhere between 1:00 and 2:00 p.m.  (Lodgment No. 1 vol. 13, ECF No. 9-13 at 49.)  After she fell out of the

high chair, Jasmine was crying but did not seem to be seriously injured. (*Id*. at 54-57.) Johnson held and comforted her until she calmed down. (*Id*. at 56.) At about 2:30 p.m., Johnson heated up some baby food and began to feed Jasmine. (*Id*. at 58, 61.) At some point during the feeding, the food began running out of Jasmine's mouth and she became limp and stopped breathing. (*Id*. at 59.) Johnson called 911 at 3:09 p.m. (*Id*. at 59-60; Lodgment No. 1 vol. 4, ECF No. 9-4 at 36.) Paramedics arrived at about 3:20 p.m., at which point Jasmine was "lifeless"; she was not breathing or moving and had no pulse. (Lodgment No. 1 vol. 4, ECF No. 9-4 at 36-38.) She appeared to be dead. (*Id*. at 58.)

Prosecution experts at trial testified that based on the nature of Jasmine's injuries and the biological changes observed in her brain, she would have become almost immediately unconscious after she was injured. (Lodgment No. 1 vol. 3, ECF No. 9-3 at 101, 105-06, vol. 5 at 21-25, vol. 7 at 62-63.) Based on his observations of Jasmine's brain, Dr. Leetsma estimated Jasmine sustained her injuries at about 1:50 p.m. (Lodgment No. 1 vol. 5, ECF No. 9-5 at 23.) Because Johnson did not call 911 until 3:09 p.m., the prosecutor argued that Johnson was not telling the truth about when or how Jasmine was injured. (Lodgment No. 1 vol. 18, ECF No. 9-17 at 39-41.)

Johnson contends that the science regarding when children become unconscious following a head injury has changed so significantly since her trial that the testimony about this was false. (Pet., ECF No. 1 at 101-04, 144-47.) She claims this new evidence establishes that Jasmine could have experienced a "lucid interval" after she fell from the high chair during which she appeared to be uninjured, supporting Johnson's version of events and explaining any delay in calling 911. (*Id*.) In addition, Johnson has proffered evidence she claims establishes that a sound heard on the 911 tape was Jasmine struggling to breathe, which indicates Jasmine was alive and breathing during the 911 call, further supporting her defense. (*Id*.; Petr's Exs., ECF No. 1-4 at 293, 1-5 at 21.)

Dr. Haddix testified that in her opinion, Jasmine would have suffered a "rapid loss of consciousness" following the injuries. (Lodgment No. 1 vol. 3, ECF No. 9-3 at 100.) Although some "involuntary activity such as breathing and heart rate were maintained for

some period of time, . . . she would clearly look unconscious." (*Id.* at 100-01.) Haddix thought it would take only a few minutes after the injuries for Jasmine to become unconscious and at the outside two hours before she stopped breathing. (*Id.* at 101.) Haddix also noted that Jasmine's brain did not have significant swelling. According to Dr. Haddix, "[b]rain swelling can occur very rapidly after a[n] injury is sustained, [and] that further supported . . . that she died not long after this injury was sustained and therefore did not have time for significant brain swelling to occur." (*Id.* at 107.) In addition, Haddix testified she examined Jasmine's thymus gland. In children, the thymus gland responds to stresses on the child such as injury or illness by shrinking. (*Id.* at 110.) Because the gland did not exhibit an appreciable amount of shrinkage, Haddix concluded Jasmine was not alive for very long after suffering her injuries. (*Id.* at 110-11.)

Dr. Leetsma agreed with Haddix that Jasmine would have become unconscious shortly after sustaining her injuries. (Lodgment No. 1 vol. 5, ECF No. 9-5 at 21, 30.) He based this opinion on his examination of slides from Jasmine's cerebral cortex which showed numerous "red neurons." (*Id.* at 16-21, 27-28.) According to Leetsma, red neurons are nerve cells that have been injured and take on a red color; they begin to develop about one to three hours after they are injured. (*Id.* at 16-18.) Leetsma said "[t]he distribution and extent and appearance of the red neurons tells me – the inference that I draw from this is that something globally happened to Jasmine Miller's brain," it was "globally damaged" by a lack of oxygen and/or circulation which occurred "no less than an hour, and two to three hours most likely" from when she was declared dead at 3:50 p.m. (*Id.* at 21.) Thus, Jasmine would have been unconscious at about 1:50 p.m. and possibly even before that, over an hour before Johnson called 911. (*Id.* at 21-23; Lodgment No. 1 vol. 13, ECF No. 9-13 at 59-60.) On cross-examination, Leetsma admitted that there had been no "knock-down, drag-out definitive study" on red neurons, and that the theory was based on "case studies in which we know what happened, witness or some documentation of when an incident occurred, and then we look at the autopsy and we see what we got." (*Id.* at 95; Lodgment No. 1 vol. 6 at 55-59.)

Dr. Alexander agreed that Jasmine would likely have been unconscious immediately after sustaining her injuries and at the very least would not have looked like a normal child.  (Lodgment No. 1 vol. 7, ECF No. 9-7 at 62-63.)  Alexander, like Haddix, noted that Jasmine's brain did not have a large amount of swelling, which indicated to Alexander that the brain had not been without oxygen for a significant amount of time and that the time between the injuries and her death was "relatively short . . . . There could not be hours that elapsed."  (*Id.* at 64.)  Alexander did not agree, however, that children who had suffered fatal head injuries could have lucid intervals.  He stated that the phenomena had not been reliably documented in children and he doubted whether such intervals were possible or likely in the case of fatal head injuries.  (Supplemental Lodgments, ECF No. 14-1 at 25-26.)  Further, he testified that the scientific literature indicated that lucid intervals do not occur with subdural hemorrhages, but they can occur with epidural hemorrhages.  (Lodgment No. 1 vol. 7 at 113-15.)  Jasmine did not have an epidural hemorrhage.  (*Id.* at 115.)

Johnson has submitted a declaration from Dr. Haddix in which she states she would comment on her testimony as follows:

> My testimony regarding an estimate of the development of symptoms (specifically unconsciousness) was "Seconds to maybe a couple of minutes. Not long at all." (Page 291, lines 5-6.)  In terms of the length of time that [Jasmine] may have continued to breath[e] after sustaining the injury, I testified, "I would say it could be up to maybe minutes.  Really at the outside I would think a couple hours.  But I would favor closer to a few minutes." (Page 291, lines 14-16.)  Taking into consideration all of the pathologic findings, including the presence of cerebral edema at only a microscopic level, the absence of acute hypoxic/ischemic changes in the brain and absence of inflammatory response in the scalp hemorrhage, I would still concur with my stated opinion that there was not an extended period of survival to incorporate the time frame prior to the arrival of Jasmine at Ms. Johnson's residence.

(Petr's Ex., ECF No. 1-6 at 5.)

Dr. Leetsma also addresses his trial testimony in the letter submitted by Johnson. Leetsma reiterates that with regard to the causes, evolution and significance of red

neurons "there has never been a robust systemic study of the phenomenon sufficient to meet the most stringent standards that have been defined for evidence in some jurisdictions." He goes on to state that studies have shown that "[red neurons] can occur in as little as 30 minutes after [an] injurious event," but that no study "ha[s] been able to control for all of the relevant variables so as to define precisely all of the determinants in a given case that may cause 'red' neurons," and that "it is probably not possible to reconstruct precisely the circumstances and their time course that may have been operating." (Petr's Ex., ECF No. 1-4 at 304.) He concludes that "[w]ere I to offer testimony in this case today regarding 'red' neurons and their time course and clinical significance, I would have to point out the limits of time reconstruction on the basis of brain histology alone." (*Id.*)

In addition, Johnson presents reports from four new experts who offer opinions as to how quickly Jasmine lost consciousness after she sustained her injuries. Dr. Plunkett, citing his own article, *Fatal Pediatric Head Injuries Caused by Short Distance Falls,* Plunkett, J., Am. J. Forens. Med Pathol. 2001, states that lucid intervals do occur in fatal head injury cases involving children. (Petr's Ex., ECF No. 1-4 at 252.) He also notes that scientific studies have found that red neurons can develop in less than an hour after a head injury. (*Id.* at 255.) Dr. Ophoven states that "[b]ecause of the unique findings of old and new bleeding in the same area, the conclusion that [Jasmine] would be immediately unconscious cannot be verified." (*Id.* at 267.) Dr. Bonnell asserts that "[t]he claim by Drs. Haddix, Leetsma, and Alexander that a lucid interval could not have occurred has been disproven many times with journal articles demonstrating lucid intervals between injury and death." (*Id.* at 273.) Dr. Reiber states that "the (red) neurons in the brain sections appear to be an artifact of staining and mechanical distortion," which leads Reiber to conclude that "there is no clear medical evidence to support the contention, to a reasonable medical certainty, that the child must have been injured at least two hours before death and lingered in moribund state." (*Id.* at 298-99.) Reiber, like Plunkett, notes that scientific studies, including one published around the

time of Johnson's trial, have found that red neurons have been seen in cases where the injury occurred less than an hour before. (*Id.* at 300.)

While the newly presented evidence calls into question the use of red neurons to determine when Jasmine's injury occurred and how quickly she would have become unconscious, Drs. Haddix and Alexander did not base their opinions that Jasmine would have lost consciousness shortly after sustaining her injuries on the presence of red neurons. Dr. Haddix based her opinion on the lack of shrinkage in Jasmine's thymus. (Lodgment No. 1 vol. 3, ECF No. 9-3 at 110-11.) Dr. Alexander based his opinion on the lack of significant brain swelling in Jasmine's brain. (Lodgment No. 1 vol. 7, ECF No. 9-7 at 64.) Contrary to Johnson's suggestion in her Opposition to the Motion to Dismiss, while Drs. Haddix and Leetsma qualify their testimony, they do not retract it. None of Johnson's experts refute the use of the thymus gland or brain swelling as methods of determining the length of time that elapsed between her injuries and her death. Moreover, Drs. Reiber and Ophoven both note that Jasmine's brain had "mild" or "minimal" brain swelling, consistent with Drs. Haddix and Alexander's observations of Jasmine's brain. (Petr's Ex., ECF No. 1-4 at 265, 297; Lodgment No. 1 vol. 3, ECF No. 9-3 at 136-41, vol. 7 at 64.) Weighing the new evidence together with the old evidence, Johnson has not presented evidence so compelling that the Court can conclude no reasonable juror would have convicted her. *Schlup*, 513 U.S. at 301; *McQuiggin*, 569 U.S. at 386. Rather, she has presented differing opinions as to what the medical evidence shows and the various causes of certain injuries.

Johnson also presents new evidence she contends supports her claim that Jasmine was alive and struggling to breathe when she called 911. She has provided an analysis of the 911 tape by an audio technician, Michael Gburzynski, who states that he found a noise on the tape which "fell within the parameters established in the original bandpass (the range of human voice) . . . at the point in the recording where the female caller asks the male operator 'did you hear that?' and the female caller then states 'that was her.'" (Petr's Ex., ECF No. 1-5 at 21.) In addition, Johnson has provided a letter from Dr.

George Nichols who listened to the enhancement of the 911 call and states that he heard "noises which I have heard on other 911 tapes of children struggling to breathe through partially obstructed airways." He contends that the tape "proves [Jasmine] was alive at the time of the call and at least attempting to breathe." (Petr's Ex., ECF No. 1-4 at 293.) But Dr. Haddix testified that although in her opinion Jasmine would have become almost immediately unconscious after sustaining her injuries, she thought it was "possible that involuntary activity such as breathing and heart rate were maintained for some period of time, but she would clearly look unconscious." (Lodgment No. 1 vol. 3, ECF No. 9-3 at 100-01.) Dr. Leetsma testified that once Jasmine sustained her injuries, a process began in which the skull fracture caused a subdural hemorrhage and brain swelling which led to Jasmine becoming unconscious and "respiratory depression, maybe circulatory failure." (Lodgment No. 1 vol. 5, ECF No. 9-5 at 31.) Jasmine would not, however, have stopped breathing instantly upon becoming unconscious. (*Id.*) Dr. Alexander also testified that it would have taken one to two hours for Jasmine to die, and thus stop breathing, after sustaining her injuries. (Lodgment No. 1 vol. 7, ECF No. 9-7 at 71.) Upon arrival, the paramedics reported that Jasmine was "lifeless" and "appeared to be dead." (Lodgment No. 1 vol. 4, ECF No. 9-4 at 36-38.) Thus, the new evidence does not directly contradict evidence presented at Johnson's trial. Both things can be true at the same time – that Jasmine was unconscious very shortly after sustaining her injuries but continued to breathe for some time until she finally succumbed to her injuries and died shortly before paramedics arrived.

### c. Short Falls and Prior Head Injuries

Johnson argues new evidence about the severity of injuries children can receive after a short fall establishes that the prosecution experts' testimony that Jasmine could not have sustained her injuries from the high chair fall was false. (Pet., ECF No. 1 at 104-10, 147-51.) She contends that "[i]t is now the overwhelming consensus among experts publishing biomechanical studies on infant head injury that impact, as with a short fall, creates 40 to 100 times the maximum G-force generated by shaking." (*Id.* at 108.)

Johnson also argues the experts at her trial inaccurately testified that Jasmine's older subdural hemorrhage did not contribute to her death. (*Id.* at 149-51.) In addition, Johnson contends current research establishes that a child with a chronic subdural hemorrhage has a lower threshold for re-injury and a higher possibility of death from a new head injury. (*Id.*)

At trial, Dr. Haddix testified that to produce the injuries seen in Jasmine – the "internal disruptions to the brain," and the "disconnections of the basic neurological structures within the brain" – "a very significant, very substantial force . . . like a motor vehicle accident, an unrestrained child in a motor vehicle accident" would have been required. (Lodgment No. 1 vol. 3, ECF No. 9-3 at 97.) She also testified, however, that children can get a skull fracture from a short fall, but that unlike Jasmine's complex, "punch-out" fracture they are "[u]sually . . . linear, again line-like fracture[s] . . which are not displaced, meaning no portion of it is inset more than the other . . . and they are not complex, meaning that they don't have multiple intersecting fractures or unusual features . . . ." (*Id.* at 98.) She further testified that although skull fractures and subdural hemorrhages can result from short falls of two to four feet, she did not think a fall from a high chair would produce the neurological disruptions seen in Jasmine's brain. (*Id.* at 99-100.) While she testified that "you don't die from short falls" on direct examination, on cross-examination she clarified that although short falls can result in skull fractures, subdural hemorrhages and possibly retinal hemorrhages, "generally speaking" they do not cause fatal head injuries. (*Id.* at 168.) Haddix opined that both fractures, the retinal hemorrhages and the new subdural hemorrhage were all from the same, recent event. (*Id.* at 88.) Haddix did not believe the old subdural hemorrhage had anything to do with Jasmine's death because it was much smaller than the new hemorrhage and was "well on its way to healing." (*Id.* at 117.) In a declaration submitted by Johnson, Dr. Haddix qualifies her trial testimony by stating that she has "personally been involved in two cases where I thought a short distance fall could have in fact been fatal," but that such incidents are "rare" and that "the potential lethality of short distance falls is far from universally

accepted by forensic pathologists, neuropathologists and pediatricians." (Pet., ECF No. 1-6 at 5.)

Dr. Leetsma agreed that the majority of falls by children do not result in anything more than bruises but it is possible for a child to suffer subdural hemorrhages, skull fractures, brain swelling and death from a three-foot fall. (Lodgment No. 1 vol. 5, ECF No. 9-5 at 85-86.) He cited biomedical studies in which it was demonstrated that an infant could sustain a skull fracture and subdural hemorrhage from a 30-inch fall and that if the fall was onto a surface that was not flat, it could produce a complex fracture. (*Id.* at 101.) Leetsma also testified that chronic subdural hemorrhages can spontaneously re-bleed and eventually cause death. (*Id.* at 116.) He agreed that Jasmine had symptoms of a chronic subdural hemorrhage in the days leading up to her death. (*Id.* at 126-27, 129-30.) In Jasmine's case, however, he did not think that the old subdural hemorrhage had spontaneously re-bled, but he did think it was possible that the injury sustained while she was in Johnson's care caused the old subdural to re-bleed. (Lodgment No. 1 vol. 6, ECF No. 9-6 at 6-8.) He could not rule out that Johnson's version of how Jasmine sustained her injuries was possible but he did not think her injuries matched with Johnson's version of events. (*Id.* at 17, 41.)

Like Dr. Haddix, Dr. Alexander testified that children can get fractures from short falls but they are generally short, linear fractures. (Lodgment No. 1 vol. 7, ECF No. 9-7 at 48.) Jasmine's skull fracture was complex, with a "punched-out" portion. (*Id.* at 52-53.) The complex nature of the left fracture, the location of the left fracture, the fact that there were multiple fractures and the extent of the left fracture led Alexander to conclude a fall from a high chair could not have produced the injuries. (*Id.* at 54, 57.) In addition, the occipital bone, where the "punch-out" fracture was located, is a thicker bone which would require more force to fracture. (*Id.* at 85.) Moreover, the injuries to Jasmine's brain were "more global," and thus Alexander believed a "major slamming force" or force equivalent to a "three-story fall" would be necessary to produce the injuries seen in Jasmine plus some element of shaking. (*Id.* at 55, 59-61.) He did not believe Jasmine's

injuries could have occurred from a short fall.  (*Id.* at 83.)  And he did not believe that the combination of injuries seen in Jasmine – the retinal hemorrhages, the brain injury and her death – would be caused by a fall from a high chair.  (*Id.*)  He also did not believe the old subdural hemorrhage contributed to her death because the "older blood there does not mean anything in particular to the brain, at most it's just a bit of irritation to the brain . . . it's not pushing the brain to one side [and] there is not mechanical pressure on the brain from that."  (*Id.* at 82.)

Using the high chair and a piece of Johnson's carpet, biomechanical engineer Dr. Ward attempted to re-create the accident as Johnson described it.  (Lodgment No. 1 vol. 8, ECF No. 9-8 at 80.)  Ward has extensive experience in biomechanics, specifically in head and neck injuries associated with car accidents.  (*Id.* at 67-68.)  Based on her own research and "the energy available [which is] only the weight of the child multiplied by the fall height," she did not believe Jasmine's injuries could not have resulted from a fall from the high chair.  (*Id.* at 121.)  She also testified that "of the hundreds and hundreds of cases that have been collected and reported upon, only one percent have skull fracture and none of those have brain damage."  (*Id.*)

In the letter he submitted in support of Johnson's Petition, Dr. Plunkett states that based on his own research, low velocity impacts can cause fatal injuries   (Petr's Ex., ECF No. 1-4 at 252.)  He also states that the understanding of biomechanics as they apply to infants has significantly changed since Johnson's trial.  Specifically, he notes that "the mechanism of head injury in an infant or toddler is fundamentally different from that in an older child or adult" because an infant's skull is pliable and can thus "inbend," causing the infant's brain to "deform and move" and can result in subdural hemorrhages, intercranial pressure and death.  (*Id.* at 254.)  Plunkett asserts that there is a decreased threshold for re-injury if a chronic subdural hemorrhage, like Jasmine had, is present until the hemorrhage is completely healed.  (*Id.* at 250.)  He also states that biomechanical engineer Dr. Carly Ward, who testified for the prosecution in Johnson's case, was incorrect when she said that infants have a higher tolerance to head injury than adults and

that low velocity impacts do not cause significant injury or death. (*Id*. at 255.) He concludes that "there is no evidence to refute Ms. Johnson's assertion that an accidental fall from a high chair caused Jasmine's injury or death," although he concedes that "there are other ways to cause her injury, including an intentional impact or an accidental 'drop.'" (*Id*. at 256.)

Dr. Ophoven states in her report that Dr. Haddix was wrong when she testified that the forces required to produce Jasmine's injuries are "similar to unrestrained children in motor vehicle accidents, children run over by cars and falls from several story building[s]." (Petr's Ex., ECF No. 1-4 at 266.) She further states that "[t]here is no[] evidence or medical literature to support these prejudicial statements and current biomechanical literature has demonstrated that these statements are not correct. Fractures of this nature can occur from a household fall or simple fall on an unyielding surface." (*Id*.) In another portion of her report, she states that Dr. Haddix's testimony "that a fall from a high chair was insufficient to cause significant injury" was "contrary to current literature and current biomechanical science." (*Id*. at 267.) Ophoven also criticizes Haddix for her opinion that the old subdural hemorrhage had nothing to do with Jasmine's death. (*Id*.) Ophoven states that Jasmine had a "pre-existing head injury with re-bleeding in the same area of the head," and opines that "[i]f the child had a significant pre-existing injury and sustained a two-foot fall with head impact, front or back, [it] could result in abrupt alterations in the autoregulatory system within the head and cause rapidly fatal results." (*Id*. at 268.) She also appears to conclude that the "punch-out" fracture is not a recent injury, disagreeing with every other expert who has expressed an opinion in this case by asserting that "[w]ith the exception of [a] very small bruise on the eye and back of the head there is no evidence of significant recent blunt force injury." (*Id*. at 268.)

Dr. Bonnell agrees with Dr. Ophoven. In his report, he states that Drs. Haddix, Alexander and Ward's testimony that Jasmine could not have died from a short fall was incorrect. (Petr's Ex., ECF No. 1-4 at 272.) He also states that "biomechanical studies

have shown this testimony is scientifically invalid and research has proven the opposite, namely, that short falls can kill." (*Id*.)

Dr. Reiber states in his report that because Jasmine's skull fractures were "basically linear fractures which stop at suture lines . . . the force necessary for causation is significantly less than initially stated (3-4 story fall or greater)." (Pet., ECF No. 1 at 298.) He goes on to state that "[l]inear fractures in this category may be seen in falls of a few (3-6) feet. Although falls of 3-4 feet rarely produce fatal subdural hematomas, such an outcome is not impossible," and "[t]he possibility of rebleeding in a pre-existing subdural neomembrane make a worse outcome from a lesser impact more likely, although at least a moderate force would still be expected." (*Id*.) He disagrees with Dr. Alexander that Jasmine's brain showed possible diffuse axonal injury. (*Id*. at 297.) He concludes that "there is no clear evidence to link a severe shaking with the episode of fatal impact, although a milder shaking episode might be contemporaneous." (*Id*. at 299.)

Finally Johnson has submitted a report from Dr. Chris Van Ee., a biomedical engineer. (Petr's Ex., ECF No. 1-4.) In his 2008 report, Van Ee states that based on scientific studies he cites from 1984 to 2004, "for the infant head, there is strong data to support that skull fracture is likely for falls onto a hard surface of 82 cm (32 inches) or more and that it is unlikely to occur for falls of 30 cm (12 inches) or less. The critical drop height for skull fracture of the infant most likely lies somewhere in between 12 inches and 32 inches for hard impact surfaces." (*Id*. at 282.) Van Ee goes on to discuss his own study of high chair falls. He states that "[n]ormal everyday experience with children and falls indicates quite clearly, that a severe head injury outcome is, thankfully, a rare occurrence for children for the broad spectrum of falls as they occur in the real world," but that "in the relatively rare case where a severe direct head impact occurs similar to the experiments described herein, a severe/fatal head injury may be the result." (*Id*. at 286.) He concludes that "a fall off of a high chair of a normal healthy child of 6 months of age resulting in a direct head impact has the potential to cause serious and even fatal head injury consistent with the head injury reported for Jasmine." (*Id*.) It is not

clear whether Van Ee's study sheds any light on whether the accident Johnson described could have produced Jasmine's injuries, however, because from the photos he provided to illustrate his study, it appears he only tested whether a child who was standing up in the high chair could have hit the back of her head on the floor when she fell. (Petr's. Ex., ECF No. 1-4 at 287.) There is no dispute that six-month old Jasmine, who Johnson said could not even sit upright in the high chair, could not have been standing in the high chair. (Lodgment No. 1 vol. 13, ECF No. 9-13 at 49.) Van Ee also states that [g]iven the likely possibility that Jasmine was still healing from a previously sustained severe head injury [the old subdural hemorrhage], she would likely have increased susceptibility to new trauma" and an "increasing likelihood that an accidental fall from the high chair could result in a fatal head injury." (*Id*.)

The new evidence regarding short falls from Drs. Plunkett, Ophoven, Bonnell, Reiber and Van Ee contradicts much of the trial testimony of Drs. Haddix and Alexander. What these new experts essentially assert, however, is that it is *rare* but *possible* that a serious head injury like the one suffered by Jasmine could result from a short fall, not that it was likely or certain. Nevertheless, there remain medical experts who believe that the skull fractures, subdural hemorrhages and retinal hemorrhages suffered by Jasmine, taken as a whole, could not have resulted from a fall from a high chair. For example, a 2015 article in the Archives of Disease in Childhood, while acknowledging "[e]stimating a fall height threshold for serious [head injury] is a debated topic," found that "low height falls, including simple stair falls, rarely cause impaired consciousness, skull fractures or [intercranial injury]." (*Head Injury From Falls in Children Younger than 6 Years of Age*, Burrows, P., et al., Arch. Dis. Child, Aug. 2015). Dr. Levin's report notes that the specific type of retinal hemorrhages he saw in Jasmine's eyes are "highly indicative of abuse." (Petr's Ex., ECF No. 1-5 at 131.) Further, a 2018 article in The Journal of Forensic Science and Medicine examined the use of biomechanics to determine how an injury occurred and concluded that "biomechanic models are not designed to 'prove' whether a proposed lethal mechanism does or does not exist *in vivo*." (*Brain Injury*

*Biomechanics and Abusive Head Trauma*, Castellani, R., et al. Journal of Forensic Science and Medicine, Apr./June 2018).  The authors also state that "[e]xtreme caution, if not skepticism, in the role of biomechanical engineering in the reconstruction of unwitnessed and complex injury scenarios is warranted."  (*Id.*)

The standard Johnson must meet is high.  She must show that "'it is more likely than not that no reasonable juror would have convicted [her] in light of the new evidence.'"  *McQuiggin*, 569 U.S. at 399, quoting *Schlup*, 513 U.S. at 327.  Despite the fact that Johnson's experts opine that a fall from a high chair could produce Jasmine's injuries, there remain reliable experts who believe that Jasmine could not have sustained her injuries from a fall from a high chair, and a reasonable juror could credit those experts over the experts who believe Jasmine's injuries could be from the high chair fall.  "The gateway should open only when a petition presents 'evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.'"  *Id*. at 401, quoting *Schlup*, 513 U.S. at 316.  The evidence Johnson has presented is not sufficient to meet this standard.

    e.  Wormian Bone and Improper Intubation

Johnson contends the "punch-out" fracture was not a fracture at all but simply a skull variation.  (Pet., ECF No. 1 at 151.)  As support for this contention, Johnson points to Dr. Ophoven's report which states that the location of the "punch-out" fracture is also the "typical location and description of a Wormian bone – not a fracture but a common variation of skull development."  (Petr's Ex., ECF No. 1-4 at 265.)  A Wormian bone is "a small irregular inconstant plate of bone interposed in a suture between large cranial bones."  Merriam Webster Medical Dictionary, available at https://www.merriam-webster.com/medical/Wormian%20bone.  Dr. Ophoven's statement does not establish that the "punch-out" fracture is actually a Wormian bone, only that the fracture is in the same location as a Wormian bone.  As the Supreme Court noted in, "under the gateway standard . . . , the newly presented evidence may indeed call into question the credibility

of the witnesses presented at trial," and "[i]n such a case, the habeas court may have to make some credibility assessments." *Schlup*, 513 U.S. at 330. Because no other expert disputes the presence of a "punch-out" fracture of Jasmine's skull, the Court concludes there is insufficient reliable evidence to support Johnson's contention that the fracture is actually a Wormian bone. This allegedly new evidence is not so compelling that no reasonable juror would convict Johnson had they had this information. *McQuiggin*, 569 U.S. at 399.

Johnson also argues the record establishes that Jasmine suffered from esophageal intubation which occurs when the intubation tube is placed in the esophagus and not the windpipe. (Pet., ECF No. 1 at 122-24, 152-53; Petr's Ex., ECF No. 1-4 at 271.) If improperly placed in this manner, air is pumped in to the stomach and not the lungs. (Petr's Ex., ECF No. 1-4 at 271.) Johnson points to Dr. Haddix's autopsy notes and the radiology report to support her contention that the intubation tube was in Jasmine's esophagus and not her trachea. (Pet., ECF No. 152-54; Petr's Ex., ECF No. 1-5 at 18.) Paramedic Caroline Gain testified her partner, Debbie Munson, placed the intubation tube into Jasmine's using a laryngoscope to direct the tube into the trachea when they arrived at Johnson's residence. (Lodgment No. 1 vol. 7, ECF No. 9-7 at 8.) Upon arrival at the emergency room, Dr. Hoecker noted that "the placement of the endotracheal tube was confirmed by direct laryngoscopy, and it did appear that the endotracheal tube was between the cords." (Petr's Ex., ECF No. 1-5 at 15.) Dr. Haddix's autopsy notes do state that "[t]he oral intubation tube terminates mid-esophagus." (Petr's Ex., ECF No. 1-5 at 9.) But Gain testified as follows:

> With babies there is no cuff on the bottom of the tube, so when you put air into the lungs, it can go into the stomach, too. It mainly goes into the lungs, but, but it could go in the stomach, and it can cause regurgitation.
>
> So we ended up with some baby oatmeal coming up through her nose and through the tubes, and we suctioned that out.

(Lodgment No. 1 vol. 7, ECF No. 9-7 at 12.)

Like Johnson's assertion regarding the Wormian bone, the record does not support a conclusion that Jasmine suffered from esophageal intubation or that it played any role in her death.

**IV. CONCLUSION**

In order to pass through the *Schlup* gateway, Johnson must establish "'it is more likely than not that no reasonable juror would have convicted [her] in light of the new evidence,'" and that the "'evidence of innocence [is] so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.'" *McQuiggin*, 569 U.S at 399, 401, quoting *Schlup*, 513 at 316, 327. The new evidence Johnson has presented consists of medical opinions that either repeat evidence that was testified to at trial or which are the subject of a continuing, spirited debate within the medical community. While the scientific understanding of the mechanism of injury for AHT and what injuries are associated with it has evolved significantly since Johnson's 1999 trial, there remains medical and other professionals who question whether infants can sustain the kinds of injuries suffered by Jasmine from a short fall and who believe injuries such as hers are indicative of intentional rather than accidental trauma. Moreover, in addition to the medical and biomechanical evidence in Johnson's case, the Court must consider Johnson's initial false statements to police and the testimony of other parents of children in Johnson's daycare. Weighing the new evidence together with the old evidence, it is not sufficient for the Court to conclude that no reasonable juror would have convicted her. *Schlup*, 513 U.S. at 316. The Court does not find that evidence of Johnson's innocence is so strong that the Court does not have confidence in the outcome. *Id.* at 327. Accordingly, the Petition is **DENIED**.

Rule 11 of the Rules Following 28 U.S.C. § 2254 require the District Court to "issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11, 28 U.S.C. foll. § 2254 (West 2019). A COA will issue when the petitioner makes a "substantial showing of the denial of a constitutional right." 28 U.S.C.

19cv1036 GPC (WVG)

§ 2253 (West 2019); *Pham v. Terhune*, 400 F.3d 740, 742 (9th Cir. 2005). A "substantial showing" requires a demonstration that "'reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'" *Beaty v. Stewart*, 303 F.3d 975, 984 (9th Cir. 2002) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). Here, the Court concludes Johnson has made the required showing, and therefore a certificate of appealability is **GRANTED**.

**IT IS SO ORDERED.**

Dated: March 3, 2020

Hon. Gonzalo P. Curiel
United States District Judge